SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court and may not summarize all portions of the opinion.

**IMO the Alleged Failure of Altice USA, Inc., to Comply with Certain Provisions of the New Jersey Cable Television Act & the New Jersey Administrative Code**
**(A-2/3-22) (086408)**

**Argued January 17, 2023 -- Decided April 3, 2023**

**FASCIALE, J., writing for a unanimous Court.**

In this appeal, Altice USA, Inc. (Altice) challenges N.J.A.C. 14:18-3.8, a regulation requiring cable companies to refund or not charge customers who cancel cable service before the end of a billing cycle for cable service after the date of cancellation. Altice argues that N.J.A.C. 14:18-38's proration requirement effectively regulates its "rates for the provision of cable service" and is therefore expressly preempted by 47 U.S.C. § 543(a)(1), a section of the federal Cable Communications Policy Act of 1984 (Cable Act). Assuming it is correct, Altice maintains that accordingly, once its customers sign up for a monthly plan, they must pay for a full final month of cable service even if they terminate service before the month ends. The Board of Public Utilities (the BPU) and Division of Rate Counsel disagree and contend this consumer protection regulation is a valid exercise of the State's police power, which they argue the Cable Act explicitly authorizes. Alternatively, Altice asserts that even if the consumer protection regulation is not preempted, the BPU expressly waived compliance with that requirement.

In 2011, Cablevision Systems Corporation (Cablevision), Altice's predecessor, petitioned the BPU for relief from various rules. BPU granted Cablevision's request for relief from compliance with certain rules, expressly conditioned on Cablevision's continuing to "prorate its bills pursuant to the requirements" of state law. As part of its request for relief, Cablevision submitted to the BPU sample customer bills that evidenced intent to continue prorating bills under N.J.A.C. 14:18-3.8.

In 2015, Altice petitioned the BPU for approval of its merger with Cablevision Cable Entities. In May 2016, the BPU issued an Order approving the merger with the expectation that Altice would comply with N.J.A.C. 14:18-3.8.

Altice then began selling cable service to New Jersey residents. On its own, Altice selected a monthly rate and billed customers at that rate. Initially, Altice

1

prorated bills for customers who cancelled service mid-month.  But that changed in October 2016.  Without notifying the BPU, Altice altered its practice and stopped prorating bills for customers who cancelled service before the end of a month.  Hundreds of customers complained to the BPU about not receiving a refund for cancelled service, which led to this enforcement action.

In 2019, finding that Altice failed to prorate customer bills in violation of N.J.A.C. 14:18-3.8, the 2011 Relief Order, and the 2016 Merger Order, the BPU ordered Altice to cease and desist from failing to prorate monthly bills; refund affected customers; remit a one-time contribution to the Altice Advantage Internet program; and audit billing records.

Altice appealed the BPU's cease-and-desist order to the Appellate Division.  Focusing solely on preemption grounds, the appellate court invalidated the order.  The Court granted certification.  252 N.J. 60 (2022).

**HELD:**  Section 543(a)(1) of the Cable Act does not preempt the proration requirement in N.J.A.C. 14:18-3.8.  The regulation does not regulate "rates for the provision of cable service," but rather prevents cable companies from charging for cable service that customers have cancelled.  The regulation does not set the "rate" that companies can charge.  It simply protects cable users from paying for service they no longer want.  Furthermore, contrary to Altice's alternative argument, neither Altice nor its predecessor sought or received a BPU waiver from prorating cable bills.

1.  The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land," notwithstanding any state law to the contrary.  U.S. Const. art. VI, cl. 2.  Here, Altice argues that Section 543(a)(1) expressly preempts N.J.A.C. 14:18-3.8.  Section 543 of the Cable Act prohibits rate regulation in competitive cable system markets.  It does not expressly prohibit proration of bills.  Instead, Section 543(a)(1) states in part that "[n]o Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section."  (emphasis added).  Section 543(a)(2) explains that "[i]f the [Federal Communications] Commission [(FCC)] finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority under this section."  N.J.A.C. 14:18-3.8, in turn, has two relevant subsections.  Under subsection (a), "Bills for cable television service shall be rendered monthly, bi-monthly, quarterly, semi-annually or annually and shall be prorated upon establishment and termination of service.  In unusual credit situations, bills may be rendered at shorter intervals."  Subsection (c) provides in part that "[i]nitial and final bills shall be prorated as of the date of the initial establishment and final termination of service."  Finally, another section of the Cable Act

2

explicitly preserves a state's police power to enact and enforce consumer protection laws. See 47 U.S.C. § 552(d)(1). Combining the preemption clause in Section 543(a)(1) and the savings clause of Section 552(d)(1), so long as a consumer-protective measure like N.J.A.C. 14:18-3.8 does not "regulate the rates for the provision of cable service," it is not specifically preempted. (pp. 10-14)

2. N.J.A.C. 14:18-3.8's proration regulation does not regulate Altice's cable "rates," let alone control "rates for the provision of cable service." The Court reviews the definitions of relevant terms used in the statute. Applying the term's ordinary and plain meaning, a "rate" is not only the price or the unit of utility service sold; it is the ratio of price to unit. Here, the challenged regulation does not even indirectly affect the actual rate Altice charges; rather, it prohibits applying the service rate to a period after a customer cancels cable service. Altice sets its own competitive marketplace "rate." N.J.A.C. 14:18-3.8's proration requirement does not "regulate" that rate -- that is, it does not fix, establish, adjust, or control Altice's rate. The regulation merely uses the rate that the cable provider sets to enforce a price proportional to the quantity of service provided. The Court disagrees with the notion that proration impliedly creates a new daily "rate" for the month of termination. Further, Section 543(a)(1) preempts only the regulation of "rates for the provision of cable service." (emphasis added). The proration requirement applies only after "final termination of service," N.J.A.C. 14:18-3.8(c), when the "provision of cable service" has ended. The Court reviews case law and FCC determinations, which support the conclusion N.J.A.C. 14:18-3.8 is not preempted by federal law. The Court notes Altice cannot by the terms of its contract interfere with the consumer-protective regulation's proration requirement. (pp. 14-24)

3. The Court disagrees that the BPU excused Altice from complying with N.J.A.C. 14:18-3.8's proration requirement. The Court reviews in detail the 2011 Relief Order and the 2016 Merger Order and notes that both orders memorialize Altice's acknowledgment that it was obligated to continue prorating customer bills under the consumer protection regulation in N.J.A.C. 14:18-3.8. (pp. 24-26)

4. The BPU's cease-and-desist order is reinstated without prejudice, subject to remand proceedings in the appellate court to resolve Altice's argument that the BPU failed to follow proper procedures in its enforcement action. (pp. 26-27)

**REVERSED and REMANDED to the Appellate Division.**

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, and WAINER APTER join in JUSTICE FASCIALE's opinion. JUSTICE SOLOMON and JUDGE SABATINO (temporarily assigned) did not participate.**

3

In the Matter of the
Alleged Failure of Altice
USA, Inc., to Comply with
Certain Provisions of the
New Jersey Cable
Television Act, N.J.S.A.
48:5A-1 et seq., and the New
Jersey Administrative Code,
N.J.A.C. 14:18-1.1 et seq.

On certification from the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| January 17, 2023 | April 3, 2023 |

Michael Zuckerman, Deputy Solicitor General, argued the cause for appellant New Jersey Board of Public Utilities (Matthew J. Platkin, Attorney General, attorney; Jeremy M. Feigenbaum, Solicitor General, and Alec Schierenbeck, Deputy State Solicitor, of counsel, and Erin M. Hodge and Viviana M. Hanley, Deputy Attorneys General, on the briefs).

Brian O. Lipman, Director, argued the cause for appellant New Jersey Division of Rate Counsel (Brian O. Lipman, Director, attorney; Brian O. Lipman and Maria T. Novas-Ruiz, Assistant Deputy Rate Counsel, on the briefs).

Matthew S. Hellman (Jenner & Block) of the District of Columbia bar, admitted pro hac vice, argued the cause for respondent Altice USA, Inc. (Schenck, Price, Smith & King, attorneys; Jeffrey T. LaRosa, Matthew S. Hellman,

1

and Howard J. Symons, of the District of Columbia bar, admitted pro hac vice, on the briefs).

JUSTICE FASCIALE delivered the opinion of the Court.

Altice USA, Inc. (Altice) challenges N.J.A.C. 14:18-3.8, a regulation requiring cable companies to refund or not charge customers who cancel cable service before the end of a billing cycle for cable service after the date of cancellation. Altice argues that N.J.A.C. 14:18-3.8's proration requirement effectively regulates its "rates for the provision of cable service" and is therefore expressly preempted by 47 U.S.C. § 543(a)(1), a section of the federal Cable Communications Policy Act of 1984 (Cable Act). Assuming it is correct, Altice maintains that accordingly, once its customers sign up for a monthly plan, they must pay for a full final month of cable service even if they terminate service before the month ends. The Board of Public Utilities (the BPU) and Division of Rate Counsel (Rate Counsel) disagree and contend this consumer protection regulation is a valid exercise of the State's police power, which they argue the Cable Act explicitly authorizes. Alternatively, Altice asserts that even if the consumer protection regulation is not preempted, the BPU expressly waived compliance with that requirement.

We hold that Section 543(a)(1) of the Cable Act does not preempt the proration requirement in N.J.A.C. 14:18-3.8. The regulation does not regulate

2

"rates for the provision of cable service," but rather prevents cable companies from charging for cable service that customers have cancelled. The regulation does not set the "rate" that companies can charge. It simply protects cable users from paying for service they no longer want. Furthermore, contrary to Altice's alternative argument, neither Altice nor its predecessor sought or received a BPU waiver from prorating cable bills.

We therefore reverse the Appellate Division's judgment that N.J.A.C. 14:18-3.8 is preempted by Section 543(a)(1) of the Cable Act. We reinstate the BPU's cease-and-desist order without prejudice and remand to the appellate court to resolve Altice's remaining argument that the BPU failed to follow proper procedures in this enforcement action.

I.

The matter reaches us after the BPU issued a cease-and-desist order finding that Altice had violated N.J.A.C. 14:18-3.8, as well as two BPU orders, by failing to prorate customers' bills, upon cancellation of service, for the month of termination.

In 2011, Cablevision Systems Corporation (Cablevision), Altice's predecessor, petitioned the BPU for relief from various rules to "level[] the playing field" between Cablevision and Verizon New Jersey, Inc. (Verizon), Cablevision's largest cable television competitor in the state. The details of

that request and a later merger between Altice and Cablevision set forth the undisputed facts, which we briefly summarize.

In 2011, the BPU issued a Relief Order granting Cablevision's request for relief from enumerated regulations, pursuant to N.J.A.C. 14:18-16.7 (repealed 2022). The Order relieved Cablevision from compliance with certain rules, expressly conditioned on Cablevision's continuing to "prorate its bills pursuant to the requirements" of state law. As part of its request for relief, Cablevision submitted to the BPU sample customer bills that evidenced intent to continue prorating bills under N.J.A.C. 14:18-3.8. Indeed, some of Cablevision's sample bills reflected credits for cable service that customers cancelled mid-month. Cablevision had long adhered to N.J.A.C. 14:18-3.8's proration requirement, as did Verizon.

In 2015, Altice petitioned the BPU for approval of its merger with Cablevision Cable Entities, which was composed of Cablevision's New Jersey entities. As part of its petition, Altice also agreed to "abide by applicable [regulations] as delineated under N.J.A.C. Title 14," which was in accord with Cablevision's 2011 Relief Order. In May 2016, the BPU issued an Order approving the merger. In issuing the 2016 Merger Order, the BPU expected Altice would comply with N.J.A.C. 14:18-3.8, an "applicable" regulation, like Cablevision and Verizon had.

4

Altice then began selling cable service to New Jersey residents. On its own, Altice selected a monthly rate and billed customers at that rate. Initially, Altice prorated bills for customers who cancelled service mid-month. But that changed in October 2016. Without notifying the BPU, Altice altered its practice and stopped prorating bills for customers who cancelled service before the end of a month. Hundreds of customers complained to the BPU about not receiving a refund for cancelled service, which led to this enforcement action.

In 2019, the BPU issued a cease-and-desist order. Finding that Altice failed to prorate customer bills in violation of N.J.A.C. 14:18-3.8, the 2011 Relief Order, and the 2016 Merger Order, the BPU ordered Altice to cease and desist from failing to prorate monthly bills; refund affected customers; remit a one-time contribution to the Altice Advantage Internet program; and audit billing records. The BPU denied Altice's motion to stay the Order.

Altice, in turn, simultaneously challenged the cease-and-desist order in state and federal courts.

In federal court, Altice obtained a preliminary injunction enjoining the BPU from enforcing its cease-and-desist order. Thereafter, the district judge ruled in Altice's favor and entered judgment on the pleadings. Relying on Spectrum Northeast LLC v. Frey, 496 F. Supp. 3d 507, 510 (D. Me. 2020) (determining that a Maine statute like N.J.A.C. 14:18-3.8 regulated rates and

was thus preempted), the district judge concluded that New Jersey's proration requirement had the effect of prescribing a daily rate for cable service provided before disconnection. The district judge found that the Cable Act preempted N.J.A.C. 14:18-3.8 because the regulation impermissibly set "Altice's rates for the provision of cable service." The BPU appealed from that judgment to the United States Court of Appeals for the Third Circuit.

Meanwhile, even before filing its federal complaint, Altice appealed the BPU's cease-and-desist order to the Appellate Division. In a decision issued after the ruling of the district judge, the Appellate Division acknowledged the district judge's reliance on Spectrum Northeast, 496 F. Supp. 3d at 510, and agreed that the "BPU's alteration of Altice's whole-month billing practice to a per diem billing methodology constituted rate regulation and was preempted by the clear and unambiguous language of the Cable Act." Focusing solely on preemption grounds, the appellate court invalidated the BPU's cease-and-desist order for the reasons provided by the district judge, and did not reach the issue to be resolved on remand.

Although Altice had won in federal district court by enjoining the BPU from proceeding in its enforcement action, and in state court by obtaining the appellate court's invalidation of the cease-and-desist order, two important decisions were issued while the BPU's petition for certification was pending.

6

Those developments altered the legal landscape on which the Appellate Division relied.

First, the United States Court of Appeals for the Third Circuit vacated the district judge's order granting judgment on the pleadings. Altice USA, Inc. v. N.J. Bd. of Pub. Utils., 26 F.4th 571 (3d Cir. 2022). It concluded the district judge should have abstained under Younger v. Harris, 401 U.S. 37 (1971), because Altice was subject to ongoing judicial proceedings when it filed its complaint in federal court, the proceedings implicated important state interests, and Altice had an adequate opportunity to raise its federal claims in the state court. Altice USA, 26 F.4th at 578-79. Second, the United States Court of Appeals for the First Circuit reversed Spectrum Northeast and concluded that Maine's Pro Rata Act (the consumer protection law like N.J.A.C. 14:18-3.8) was not preempted by the Cable Act because it did not regulate "rates for the provision of cable service." Spectrum Ne., LLC v. Frey, 22 F.4th 287, 288 (1st Cir. 2022), cert. denied, 143 S. Ct. 562 (2023).

We granted certification, 252 N.J. 60 (2022), and now turn to the parties' preemption and waiver arguments.

## II.

On appeal, the BPU emphasizes that it has long required cable companies to refund New Jersey customers who paid in advance for cable

7

service that they later terminate. The BPU contends that N.J.A.C. 14:18-3.8 is not preempted by the Cable Act for three reasons. First, N.J.A.C. 14:18-3.8 does not regulate "rates" under Section 543(a); it provides for proration of the rate the cable company sets when a customer cancels service mid-month. The BPU argues there is no other plausible interpretation of "rate" under Section 543(a), but if there is, the BPU asserts the presumption against preemption applies. Second, N.J.A.C. 14:18-3.8 does not regulate "rates for the provision of cable service," as the First Circuit decided in Spectrum Northeast, because service ends when the customer cancels. Third, the Cable Act's text, structure, and context explicitly demonstrate Congressional authorization for states to enact and enforce consumer protection laws like N.J.A.C. 14:18-3.8. The BPU maintains further that Altice violated the 2011 Relief Order and 2016 Merger Order by failing to prorate because the BPU never waived that requirement.

Rate Counsel, which is established by law to advocate for New Jersey ratepayers in matters concerning regulated utilities, supports the BPU's contentions on appeal. Rate Counsel argues the regulation does not tell cable companies what "rate" to charge; instead, it protects consumers by requiring proration upon cancellation. Rate Counsel also argues that Altice's continued provision of service after customers cancel violates the consumer protection regulation, so despite Altice's efforts to continue providing service after

8

cancellation, the regulation does not concern "the provision of cable service." Thus, Rate Counsel asserts, there is no preemption under the Cable Act.

Altice argues it is not obligated to prorate for two reasons. First, it asserts N.J.A.C. 14:18-3.8's proration requirement regulates "rates for the provision of cable service" because it forces Altice to sell cable service at a fixed daily rate for the month of termination and is therefore expressly preempted by Section 543(a)(1) of the Cable Act. Along those lines, Altice asserts its customers are contractually bound to pay for service for the entire month even if they cancel mid-month. So, Altice argues, the First Circuit's reasoning that Maine's similar proration law does not concern "the provision of cable service" is inapposite here. Second, Altice contends in the alternative that the BPU expressly waived its obligation to prorate customer bills. In support of Altice's waiver argument, Altice points to the 2011 Relief Order.

III.

We begin by addressing whether the Cable Act preempts N.J.A.C. 14:18-3.8's consumer protection measure. Preemption determinations are reviewed de novo, as are the issues of statutory interpretation necessary to the preemption inquiry. In re Reglan Litig., 226 N.J. 315, 327 (2016). Before reaching the relevant sections of the Cable Act and N.J.A.C. 14:18-3.8, we briefly summarize the federal preemption doctrine.

9

A.

A bedrock principle of the United States Constitution is that Congress is empowered to preempt state law. Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363, 372 (2000). The Supremacy Clause of the United States Constitution provides that federal law "shall be the supreme Law of the Land," notwithstanding any state law to the contrary. U.S. Const. art. VI, cl. 2. But "States are independent sovereigns in our federal system." Medtronic, Inc. v. Lohr, 518 U.S. 470, 485 (1996). Thus, the preemption analysis begins with the "assumption that the historic police powers of the States [are] not to be superseded by [a] [f]ederal [a]ct unless that was the clear and manifest purpose of Congress." Altria Grp., Inc. v. Good, 555 U.S. 70, 77 (2008) (first alteration in original) (quoting Rice v. Santa Fe Elevator Corp., 331 U.S. 218, 230 (1947)). Consumer protection is a traditional area of state police power. See, e.g., Garden State Farms, Inc. v. Mathis, 61 N.J. 406, 424-25 (1972) (finding an act that included the purpose of consumer protection to be a valid exercise of police powers).[1]

---

[1] A presumption against preemption applies with "particular force" in cases concerning traditional areas of state regulation. Altria Grp., 555 U.S. at 77. The United States Supreme Court recently expressed, in broad language, that the presumption against preemption will not be applied to interpret express preemption clauses. Puerto Rico v. Franklin California Tax-Free Tr., 579 U.S. 115, 125 (2016) (stating that "because the statute 'contains an express

10

Under the Supremacy Clause, federal law preempts state law in three circumstances. English v. Gen. Elec. Co., 496 U.S. 72, 78 (1990). First, preemption is found when Congress explicitly preempts state law. Ibid. If the text of a preemption clause has more than one plausible reading, however, "courts ordinarily 'accept the reading that disfavors pre-emption.'" Altria Grp., 555 U.S. at 77 (quoting Bates v. Dow Agrosciences LLC, 544 U.S. 431, 449 (2005)). Second, a law is preempted when Congress regulates conduct in a field it intended to occupy exclusively. English, 496 U.S. at 79. "Field preemption applies 'where the scheme of federal regulation is "so pervasive as to make reasonable the inference that Congress left no room for the States to supplement it."'" In re Reglan Litig., 226 N.J. at 328 (quoting Gade v. Nat'l Solid Wastes Mgmt. Ass'n, 505 U.S. 88, 98 (1992)). Third, federal law

preemption clause,' [the Court did] not invoke any presumption against preemption but instead 'focus[ed] on the plain wording of the clause, which necessarily contains the best evidence of Congress' pre-emptive intent'" (quoting Chamber of Commerce of United States of America v. Whiting, 563 U.S. 582, 594 (2011)). Relying on two Third Circuit cases, the BPU maintains the presumption against preemption nevertheless applies because Franklin involved a Bankruptcy Code provision rather than cases concerning traditional areas of state regulation. See Lupian v. Joseph Cory Holdings LLC, 905 F.3d 127, 131 n.5 (3d Cir. 2018); Shuker v. Smith & Nephew, PLC, 885 F.3d 760, 771 n.9 (3d Cir. 2018). As we later explain, without applying the presumption we still conclude that Section 543(a)(1) does not preempt the proration requirement in N.J.A.C. 14:18-3.8 because the consumer protection regulation simply prevents cable companies from charging for cable service that customers have cancelled and does not regulate "rates for the provision of cable service."

11

preempts state law when state law "actually conflicts with federal law."

English, 496 U.S. at 79. "Conflict preemption applies 'where "compliance with both federal and state regulations is a physical impossibility"' . . . 'or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress."'" In re Reglan Litig., 226 N.J. at 329 (internal citation omitted) (quoting Gade, 505 U.S. at 98). Preemptive purpose, express or implied, is found "in the text and structure of the statute at issue." CSX Transp., Inc. v. Easterwood, 507 U.S. 658, 664 (1993).

B.

Altice relies solely on express preemption. That is, Altice argues Section 543(a)(1) expressly preempts N.J.A.C. 14:18-3.8.

Section 543 of the Cable Act prohibits rate regulation in competitive cable system markets. It does not expressly prohibit proration of bills. Instead, Section 543(a)(1) states in part that "[n]o Federal agency or State may regulate the rates for the provision of cable service except to the extent provided under this section." (emphasis added). Section 543(a)(2) explains that "[i]f the [Federal Communications] Commission [(FCC)] finds that a cable system is subject to effective competition, the rates for the provision of cable service by such system shall not be subject to regulation by the Commission or by a State or franchising authority under this section." In 2015, the FCC

12

established a rebuttable presumption that cable markets are subject to "effective competition." 47 C.F.R. § 76.906. It is undisputed that Altice is subject to "effective competition," so under Section 543(a)(1), New Jersey may not regulate Altice's "rates for the provision of cable service."

N.J.A.C. 14:18-3.8, in turn, has two relevant subsections. Under subsection (a), "Bills for cable television service shall be rendered monthly, bi-monthly, quarterly, semi-annually or annually and shall be prorated upon establishment and termination of service. In unusual credit situations, bills may be rendered at shorter intervals." Subsection (c) provides in part that "[i]nitial and final bills shall be prorated as of the date of the initial establishment and final termination of service."

We note that another section of the Cable Act explicitly preserves a state's police power to enact and enforce consumer protection laws: Section 552(d)(1), entitled "[c]onsumer protection laws," provides that "[n]othing in [the Cable Act] shall be construed to prohibit any State or any franchising authority from enacting or enforcing any consumer protection law, to the extent not specifically preempted by [the Cable Act]." 47 U.S.C. § 552(d)(1) (emphasis added). Congress thus included a savings clause anticipating that states would exercise police powers to enact and enforce laws safeguarding

13

cable consumers, such as the consumer-protective proration requirement of N.J.A.C. 14:18-3.8.

Combining the preemption clause in Section 543(a)(1) and the savings clause of Section 552(d)(1), so long as a consumer-protective measure like N.J.A.C. 14:18-3.8 does not "regulate the rates for the provision of cable service," it is not specifically preempted. The parties agree that because the Cable Act does not explicitly define the terms "regulate," "rates," or "the provision of cable service," the ordinary meanings of those terms apply. See, e.g., Sandifer v. U.S. Steel Corp., 571 U.S. 220, 227 (2014) ("It is a 'fundamental canon of statutory construction' that, 'unless otherwise defined, words will be interpreted as taking their ordinary, contemporary, common meaning.'" (quoting Perrin v. United States, 444 U.S. 37, 42 (1979))).

With that background in mind, we apply express preemption principles to this appeal.

IV.

We conclude that N.J.A.C. 14:18-3.8's consumer protection proration regulation does not regulate Altice's cable "rates," let alone control "rates for the provision of cable service." We reach that conclusion by deriving ordinary meaning from the text of N.J.A.C. 14:18-3.8 and Sections 543(a)(1) and 552(d)(1) of the Cable Act.

14

The 1981 edition of Webster's Third New International Dictionary, released shortly before the Cable Act passed, contains several definitions of "rate." One definition is "a charge, payment, or price fixed according to a ratio, scale, or standard," as in "drapery fabrics bought at the rate of a dollar a yard." Webster's New International Dictionary 1884 (3d ed. 1981); accord Black's Law Dictionary 1134 (5th ed. 1979). In the utility context, a "rate" is defined as the "charge per unit of a public-service commodity (as electricity, gas, water)." Webster's New International Dictionary 1884 (3d ed. 1981). In other words, a rate is "[t]he amount of a charge or payment . . . as a proportion of some other amount or as a basis of calculation." Oxford English Dictionary Online, https://www.oed.com.resources.njstatelib.org/view/Entry/158412 (last visited Mar. 9, 2023). Applying the FCC's definition of "rate," which it has used in telephone communications cases, the United States Court of Appeals for the First Circuit has explained that "a 'rate' depends" on three factors: "the price charged, . . . the type [of service,] and [the] amount of service provided." Spectrum Ne., 22 F.4th at 292. Applying its ordinary and plain meaning, a "rate" therefore is not only the price or the unit of utility service sold; it is the ratio of price to unit.

The plain meaning of "regulate" is "to govern or direct according to rule or to bring under control of constituted authority," or "to fix, establish, or

15

control; to adjust." Black's Law Dictionary 1156 (5th ed. 1979). Finally, to "prorate" means to "divide, distribute, or assess proportionately." Webster's New International Dictionary 1820 (3d ed. 1981).

Under those plain language definitions, laws that restrict price increases; set a price ceiling, i.e., by capping the "rate" at a certain percentage above the provider's cost; or limit factors that a cable provider can consider in setting its "rate" would be forms of rate regulation because they would "fix, establish, or control" the "charge per unit" a provider could impose. See Spectrum Ne., 22 F.4th at 293. A rate-freeze provision, which would prohibit cable providers from raising cable "rates," would similarly "regulate" rates. See Norwood v. Adams-Russell Co., 549 N.E.2d 1115, 1118-19 (Mass. 1990). Regulations that either prohibit or authorize the pass-through of cost increases to consumers via rate increases constitute rate regulation as a "direct regulation of the permissible amount of a rate increase." See ACLU v. FCC, 823 F.2d 1554, 1571 (D.C. Cir. 1987). Likewise, prohibiting cable providers from passing civil penalty costs on to subscribers through rate increases is impermissible rate regulation. See Westmarc Commc'ns v. Conn. Dep't of Pub. Util. Control, 807 F. Supp. 876, 887-89 (D. Conn. 1990).

The plain and ordinary meaning of rate regulation, however, is not so broad as to encompass all laws that affect or concern cable prices. In Cable

16

Television Ass'n v. Finneran, for example, the Second Circuit held that regulations prohibiting downgrade charges did not "regulate the rates" for the provision of cable service because they would have an indirect effect, at most, on the cable rates that cable providers charged if cable providers chose to pass on added costs to customers. 954 F.2d 91, 101 (2d Cir. 1992). A law that prohibits conditioning access to one cable service on the purchase of another service has similarly been found to not be a rate-regulating measure because it has only "an indirect effect on cable rates." Morrison v. Viacom, Inc., 52 Cal. App. 4th 1514, 1529-30, as modified on denial of reh'g by 53 Cal. App. 4th 1126B (1997).[2]

Here, the challenged regulation does not even indirectly affect the actual rate Altice charges; rather, it prohibits applying the service rate to a period after a customer cancels cable service. Altice sets its own competitive

---

[2] Courts have reached divergent conclusions on the question whether anti-monopoly statutes regulate rates. The United States Court of Appeals for the Ninth Circuit concluded a law that prohibits setting cable rates below a certain threshold with the intent to injure competition does not regulate rates because it is "directed at the seller's conduct rather than the seller's actual rates." Total TV v. Palmer Commc'ns, Inc., 69 F.3d 298, 301 (9th Cir. 1995). But the United States District Court for the Middle District of Alabama held that a similar anti-monopoly law does regulate rates because, in prohibiting rates that are injurious to competition, the law "[d]oes no more or less than prohibit certain rates." Storer Cable Commc'ns v. City of Montgomery, 806 F. Supp. 1518, 1543 (M.D. Ala. 1992).

marketplace "rate." If Altice sets a hypothetical monthly rate of $100 for cable service, and a customer cancels service halfway through a thirty-day month, the proration regulation requires Altice to charge that customer $50 rather than $100 because the customer terminated the service mid-month. Altice's rate remains the same, and the customer is charged a proportion of the rate price equal to the proportion of the month for which service was provided. A consumer that buys a half-pound of produce which is sold at a per-pound rate, similarly, pays half the price of a full pound. N.J.A.C. 14:18-3.8's proration requirement does not fix, establish, adjust, or control Altice's rate. Applying the ordinary definitions of the relevant terms, the regulation merely uses the rate that the cable provider sets to enforce a price proportional to the quantity of service provided.[3] We disagree with the notion that proration impliedly creates a new daily "rate" for the month of termination.

Even if N.J.A.C. 14:18-3.8's proration requirement sets Altice's rate in a manner that would otherwise constitute rate regulation, which we emphasize cannot be the case when one applies the ordinary meaning of "rate," Section 543(a)(1) preempts only the regulation of "rates <u>for the provision of cable service</u>." (emphasis added). The Cable Act defines cable service as the

---

[3] An agency's labeling of a regulation will not be determinative, but we note, nonetheless, that the proration requirement regulation is embedded in a section entitled "Method of billing."

18

transmission of video programming to subscribers. 47 U.S.C. § 522(6)(A).

Upon cancellation, a former customer is no longer a "subscriber." Congress

did not prevent states from regulating cable charges when a consumer cancels

and the provision of cable service should have ended. Instead, in Section

552(d)(1), it permitted states to enact and enforce consumer protection laws

preventing cable companies such as Altice from charging customers for

cancelled service. The proration requirement applies only after "final

termination of service," N.J.A.C. 14:18-3.8(c), when the "provision of cable

service" has ended.

In the closest reported case to the one before us, the First Circuit relied

on the fact that proration applies only after service is terminated in concluding

that a Maine statute was not preempted by the Cable Act. Maine enacted a

consumer-protective proration requirement requiring cable operators to grant

subscribers pro rata credits if they cancel cable service three or more days

before the end of a billing period. Spectrum Ne., 22 F.4th at 288. The First

Circuit held that Maine's statute (the Pro Rata Act) is not preempted by the

Cable Act because it does not regulate "rates for the provision of cable

service." Ibid. Applying the plain and ordinary meaning of "rates" and "rates

for the provision of cable service," the First Circuit stated:

> [T]he rate for "the provision of cable service" is not
> naturally read to encompass a termination rebate. A

19

> termination event ends cable service, and a rebate on termination falls outside the "provision of cable service." Thus, the plain language of § 543 excludes the time after provision of service -- i.e., the only time when Maine's Pro Rata Act applies.
>
> [Id. at 292-93.]

In reaching its narrow holding, the court analyzed a hypothetical law that would "cap the amount that a cable operator could charge a customer on an ongoing monthly basis for cable service" by setting a $50 limit. Id. at 293. It contrasted that with Maine's Pro Rata Act, stressing that -- like N.J.A.C. 14:18-3.8 -- Maine's Pro Rata Act regulates "only the charge that the cable operator may impose on a customer for the month in which that customer has terminated -- i.e., when the cable operator no longer provides -- 'cable service.'" Ibid.

We likewise find that N.J.A.C. 14:18-3.8 does not implicate "the provision of cable service." The plain meaning of "provision of" does not encompass matters governing the termination of service or the period after which service is terminated.

We are not persuaded by Altice's argument that N.J.A.C. 14:18-3.8 concerns the provision of cable service because Altice "contracts" with customers to provide service in full-month increments. The BPU was authorized by legislation, under the State's police powers, to enact and enforce

20

consumer protection regulations, including one that protects customers from paying for cable service they affirmatively cancel.  See N.J.S.A. 48:5A-9(b) (granting the BPU the full power and authority to "[s]upervise and regulate every CATV company operating within this State and its . . . contracts . . . and to do all things . . . necessary or convenient in the exercise of such power and jurisdiction"), -10(b) (empowering the BPU, in part, to promulgate "rules and regulations" governing "[t]he prohibition and prevention of the imposition of any unjust or unreasonable, unjustly discriminatory or unduly preferential individual or joint rate, charge or schedule for any service supplied or rendered by a CATV company within this State").

A contract provision that interferes with such consumer-protective regulation would be unenforceable and void as illegal.  See, e.g., Sun Life Assur. Co. of Can. v. Wells Fargo Bank, N.A., 238 N.J. 157, 187 (2019) ("A contract may be void because it is . . . illegal."  (quoting D'Agostino v. Maldonado, 216 N.J. 168, 194 n.4 (2013))); see also Brandon Farms Prop. Owners Ass'n v. Brandon Farms Condo. Ass'n, 180 N.J. 361, 374 (2004) (observing that this Court has "void[ed] contracts that 'violate statutes'" (quoting Vasquez v. Glassboro Serv. Ass'n, 83 N.J. 86, 99 (1980))).  Altice's purported contract provision -- which it did not explicitly identify before this Court, the Appellate Division, or the BPU -- cannot invalidate a consumer's

21

right to proration guaranteed under N.J.A.C. 14:18-3.8. Since the alleged contract provision is void, service effectively terminates upon a customer's request, and the proration requirement does not concern the provision of cable service.

We note that the text of Section 543(a)(1) of the Cable Act does not evidence Congress's clear purpose to supersede New Jersey's police power to enact and enforce N.J.A.C. 14:18-3.8's proration rule, a consumer protection law. And, Congress included a savings clause in Section 552(d)(1), anticipating that states would exercise police powers to enact and enforce laws safeguarding cable consumers.

Indeed, the FCC has also read Section 543(a)(1) and Section 552(d)(1) together to conclude proration-analogous requirements are not preempted under the Cable Act. The FCC explained that although Section 543(a)(1) prevents states from regulating the "reasonableness of the actual rate charged," Section 552(d)(1) preserves the states' authority to regulate "the circumstances under which a cable operator may <u>bill</u> a subscriber for a particular service." <u>In re Implementation of Cable Act</u>, 9 F.C.C. Rcd. 4316, 4361 (1994) (emphasis added). Consequently, the FCC interpreted the Cable Act to permit states to limit the practice of "negative option billing," in which subscribers receive and are charged for service they have not affirmatively requested. Such laws are

22

more akin to a "consumer protection measure rather than a rate regulation provision per se." Ibid. The FCC read the Cable Act to "preserve[] the ability of a state or local government . . . to regulate negative option billing" even though Section 543(a)(1) prohibits regulation of "rates for the provision of cable service." Id. at 4362. The United States Court of Appeals for the D.C. Circuit deemed the FCC's approach reasonable, because "the prohibition against negative option billing is directed entirely at the terms of purchase and sale other than rates." Time Warner Ent. Co., L.P. v. FCC, 56 F.3d 151, 194 (D.C. Cir. 1995).

The same logic applies here. N.J.A.C. 14:18-3.8's consumer protection proration regulation, like the permissible limitation on negative option billing, regulates "the circumstances under which a cable operator may bill a subscriber for a particular service." (emphasis added). That is, the proration requirement determines whether a cable company can charge a consumer for cancelled service rather than the "reasonableness of the actual rate charged." In re Implementation of Cable Act, 9 F.C.C. Rcd. at 4361; see also Time Warner, 56 F.3d at 194 (upholding authority to regulate negative option billing as a "consumer protection provision rather than rate regulation"). In the case of negative option billing practices, the customer has not affirmatively

requested the service in question; here, the customer has affirmatively <u>rejected</u> cable service.

In sum, under the plain and ordinary meaning of rate regulation, N.J.A.C. 14:18-3.8 does not regulate "rates," nor does it regulate rates "for the provision of cable service." This is particularly true in light of the express preservation of the states' authority to enact consumer-protective measures in Section 552(d)(1). Although we do not apply the presumption against preemption to reach our conclusion, the presumption would -- if it retains its vitality in express preemption cases that concern traditional areas of state regulation -- compel the same result.

Having concluded that N.J.A.C. 14:18-3.8 is not preempted by federal law, we next turn to Altice's argument that the BPU waived Altice's obligation to comply with the regulation.

V.

Altice argues that the BPU excused it from complying with N.J.A.C. 14:18-3.8's proration requirement. We disagree. The 2011 Relief Order and the 2016 Merger Order memorialize the representations of Cablevision and Altice that they would continue to prorate bills. Altice's contention that the BPU waived that obligation is unsupported by the two BPU orders the parties urge us to interpret.

24

About one month before Cablevision petitioned the BPU for relief from various rules, the BPU had granted Verizon's rule-relief petition (Verizon Order). Cablevision based its petition on the Verizon Order, seeking similar treatment as Verizon to "equal the [competitive] playing field." Cablevision's petition did not seek relief beyond the scope of the BPU's grant of relief to Verizon. Like Verizon's earlier petition for rule relief, Cablevision's petition did not explicitly request relief from its obligation to prorate bills when customers cancel service. Indeed, Verizon submitted a sample bill demonstrating how it would continue to prorate bills under N.J.A.C. 14:18-3.8. Cablevision, too, produced sample bills demonstrating, in instances shorter than a full billing cycle, how Cablevision would continue to prorate.

The BPU granted relief to Cablevision, relying on its representations that it, like Verizon, would continue prorating customers' cable bills. The BPU issued its 2011 Relief Order on Cablevision's representation that the rule relief waiver would not "harm consumers." The BPU explicitly made that condition clear.

In November 2015, Altice sought BPU approval to merge with Cablevision. As part of its merger petition, Altice indicated that it would abide by all of Cablevision's obligations under existing local franchise agreements. Altice is therefore bound by the 2011 Relief Order, in which the

25

BPU did not waive compliance with N.J.A.C. 14:18-3.8's proration requirement.  The subsequent 2016 Merger Order, which affirmed that Altice would continue to be bound by all applicable regulations, thereby incorporated the proration requirement.  At no point did Verizon or Cablevision expressly ask the BPU for relief from the proration requirement.  And neither did Altice, as conceded at oral argument.

The parties to the merger petition engaged in extensive discovery that further supports our conclusion that the BPU never waived Altice's obligation under N.J.A.C. 14:18-3.8.  In May 2016, Altice, Rate Counsel, and the BPU reached an agreement on all "factual and legal issues" regarding the merger.  Altice agreed to "abide by . . . N.J.A.C. Title 14, . . . including . . . requirements related to billing practices and terminations."  One week later, the 2016 Merger Order repeated verbatim Altice's settlement agreement to abide by Chapter 18's "requirements related to billing practices and termination."  The orders memorialize Altice's acknowledgment that it was obligated to continue prorating customer bills under the consumer protection regulation in N.J.A.C. 14:18-3.8.

## VI.

The judgment of the Appellate Division that N.J.A.C. 14:18-3.8 is preempted by Section 543(a)(1) of the Cable Act is reversed.  The BPU's

cease-and-desist order is reinstated without prejudice, subject to remand proceedings in the appellate court to resolve Altice's argument that the BPU failed to follow proper procedures in its enforcement action. We leave to the appellate court's discretion how to proceed on remand.


CHIEF JUSTICE RABNER and JUSTICES PATTERSON, PIERRE-LOUIS, and WAINER APTER join in JUSTICE FASCIALE's opinion. JUSTICE SOLOMON and JUDGE SABATINO (temporarily assigned) did not participate.

27